## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Crim. Action No. 12-266 (2), (3) (ABJ) |
| | ) | |
| DWIGHT KNOWLES, | ) | |
| ORAL GEORGE THOMPSON, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### MEMORANDUM OPINION & ORDER

Defendants Dwight Knowles and Oral George Thompson are charged in a one-count indictment with conspiring to distribute and to possess with intent to distribute at least five kilograms of cocaine on board an aircraft registered in the United States, in violation of 21 U.S.C §§ 959(b) (2012)[1] (substantive offense); 21 U.S.C. § 963 (conspiracy); and 18 U.S.C. § 2 (aiding and abetting). *See* Redacted Indictment [Dkt. # 17]. The crimes for which defendants have been charged carry a mandatory minimum sentence of ten years of incarceration and a maximum penalty of life imprisonment. 21 U.S.C. § 960(b)(1)(B).

The defendants have each filed motions to dismiss the indictment. Def. Thompson's Mot. to Dismiss Indictment [Dkt. # 120] ("Thompson Mot."); Def. Knowles's Mot. to Dismiss Indictment [Dkt. # 128] ("Knowles Mot."). Both point out that until their arrest and detention in this case, they had never stepped foot in the United States, and that the drugs that the government

---

1       Congress amended section 959 on May 16, 2016 to add a new subsection "a," to add a new subsection "b," and to "redesignat[e] subsections (b) and (c) as subsections (c) and (d) respectively. Transnational Drug Trafficking Act of 2015, Pub. L. No. 114–154, 130 Stat 387 (2016). Because the defendants were charged under the previous iteration of the statute, and because the amendments do not substantively change any aspect of the statutory analysis, the Court will refer to the statute throughout this Memorandum Opinion as it existed in 2012.

alleges that they conspired to transport were not destined for the United States. So the only nexus to the United States in this case is that the airplane that defendants allegedly used in furtherance of the conspiracy was registered in the United States.

Both defendants argue that bringing them before a court in the United States to answer charges of United States law violates the Due Process Clause. Thompson Mot. at 1; Knowles Mot. at 10–12. Knowles has also advanced the position – which Thompson has adopted – that the statute involved in this case does not authorize an exercise of extraterritorial jurisdiction over the offense of possession with intent to distribute, as opposed to distribution, and that Congress lacked the power to "criminalize criminal activity with no nexus to the United States" in any event. Knowles Mot. at 1–2; Mot. to Join & Adopt Mot. of Codefendant [Dkt. # 137]; Min. Entry (May 19, 2016) (noting that the Court granted Thompson's motion to adopt Knowles's motion). The government opposes both motions. Gov't Mem. in Opp. to Thompson Mot. [Dkt. # 123] ("Opp. (Thompson)"); Gov't Mem. in Opp. to Knowles Mot. [Dkt. # 130] ("Opp. (Knowles)"). Defendant Knowles replied in support of his motion; Thompson did not file a reply. *See* Def. Knowles Reply in Supp. of Knowles Mot. [Dkt. # 132] ("Knowles Reply").

Defendants have raised important questions about the proper interpretation of 21 U.S.C. § 959 (2012), the limits of Congress's enumerated powers to criminalize acts that take place on foreign soil, and whether prosecutions based on the statute comport with due process. But the Court finds that both of the motions to dismiss must be denied. The text of the provision that creates extraterritorial jurisdiction – criminalizing an "act of distribution" that occurs on foreign soil, *see* 21 U.S.C. § 959(c) (2012) – and the structure of the statute as a whole reflect Congress's intention to reach possession with intent to distribute. Further, the commerce clause of the United States Constitution gave Congress the authority to enact section 959(b). Finally, defendants' due

process arguments fail because an international treaty placed both on notice that the alleged conduct in this case could subject them to prosecution in a foreign state.  The Court notes that its ruling on the due process question rests on its reading of *United States v. Ali*, 718 F.3d 929 (D.C. Cir. 2013), and the existence of the treaty, and that the government has not pointed to any facts other than the registration of the airplane to justify the exercise of United States jurisdiction over these particular defendants.  *See* Notice of Gov't's Position [Dkt. # 131] ("Gov't Notice") at 1.

## BACKGROUND

### I.    Factual Background

The government alleges that the defendants "are members of a high-level drug transportation organization responsible for conspiring to transport on board aircraft registered in the United States multi-thousand kilogram quantities of cocaine."  Status Report Regarding Gov't's Extradition Reqs. to Colombia [Dkt. # 22] ¶ 2.  The government's evidence at trial will consist of "email communications obtained pursuant to federal search warrants in this investigation, lawful wiretaps in Colombia, information from confidential sources, consensually-recorded conversations, and documents and photographs provided to the Government by Bahamian, Haitian, and Colombian law enforcement authorities."  *Id.*  That evidence will allegedly show that "between May 2011 and December 2012, the Defendants and others arranged to transport between 2,400 and 4,500 kilograms of cocaine on-board the United States registered aircraft bearing tail number N157PA . . . from the Colombia-Venezuela border to Honduras."  *Id.*

The government has summarized defendants' roles in the alleged conspiracy as follows:

> [F]rom on or about at least May 2011 to December 12, 2012, Defendants
> Thompson and Knowles, while based in Santa Marta, Colombia, entered
> into an agreement with various co-conspirators, to include, but not limited
> to, pilot Dario Davis and drug-trafficker Trevor Ferguson, both based in
> Nassau, Bahamas, to transport large quantities of cocaine.   Defendant
> Thompson utilized his contacts in Colombia and Venezuela – to include
> cocaine brokers, investors, sources of supply, and members of drug

3

trafficking organizations – to attempt to arrange various cocaine transportation transactions, including the transportation of large quantities of cocaine via boat, aircraft, and shipping containers in furtherance of this conspiracy. As part of this conspiracy, Defendants Thompson and Knowles worked together to attempt to utilize various aircraft to traffic cocaine, including U.S. registered and foreign registered aircraft, primarily located in the United States, the Bahamas, the Dominican Republic, Panama, and Belize. One aircraft, among others, that the Defendants conspired to use to traffic narcotics was a U.S. registered aircraft with tail number N157PA that was ultimately detained and seized in Haiti, resulting in the arrest of Dario Davis and Trevor Ferguson.

Opp. (Thompson) at 2; Opp. (Knowles) at 2.

## II.   Procedural History

The defendants were indicted, under seal,[2] on December 12, 2012, and charged with one count of conspiring, "in the Bahamas, Colombia, Haiti, Honduras, Venezuela, the Dominican Republic, and elsewhere . . . to knowingly and intentionally, on board an aircraft registered in the United States or owned by a United States citizen, distribute, and possess with intent to distribute, five kilograms or more of a mixture and substance containing a detectable amount of cocaine," in violation of 21 U.S.C. §§ 959(b) (2012), 960(b)(1)(B), 963, and 18 U.S.C. § 2. Sealed Indictment [Dkt. # 3]. Defendant Thompson – a Jamaican citizen residing in Colombia – was extradited to the United States on or around March 28, 2014, *see* Arrest Warrant (Thompson) [Dkt. # 39], and defendant Knowles – a Bahamian citizen also residing in Colombia – was extradited on or around September 25, 2014. *See* Arrest Warrant (Knowles) [Dkt. # 49].

Defendant Thompson filed a motion to dismiss the indictment on February 12, 2016, Thompson Mot., and defendant Knowles filed a motion to dismiss the indictment on April 11,

---

2    The seal was lifted after the defendants were extradited to the United States. *See* Order (May 23, 2013) [Dkt. # 16] (unsealing the indictment, but redacting Knowles's name); Redacted Indictment. It appears to the Court that the government has not filed an unredacted Indictment that includes defendant Knowles, but since the case against Knowles has not proceeded under seal, the Court will not seal this Memorandum Opinion.

2016.  Knowles Mot.  The government has opposed both motions.  Opp. (Thompson); Opp. (Knowles).  The Court held a hearing on the motions on May 19, 2016.  Min. Entry (May 19, 2016).

Defendant Thompson initially challenged the indictment on due process grounds.  He asserts that "under the circumstances, bringing Thompson before a court in the United States to answer charges of United States law violates the Due Process Clause," because he "could not have 'reasonably anticipate[d]' that his conduct could result in 'being haled into court in this country.'" Thompson Mot. at 1, 6, quoting *Ali*, 718 F.3d at 944.  He maintains that there is "no nexus between his actions abroad and the United States," and he submits that the prosecution in the United States is unfair under the particular factual circumstances of the case:

> [H]e is a Jamaican citizen residing in Colombia, not the United States.  Prior to his extradition, he had neither entered the United States nor had any contact with the United States.  None of the alleged criminal conduct occurred within the United States.  None of the alleged communications occurred with anyone located in the United States.  No financial assets were deposited into, withdrawn from, or interacted with the United States monetary system.  No alleged coconspirators were recruited from, nor managed by, any person located in the United [S]tates.  In fact, it appears that none of the conspiratorial conduct occurred within the United States.

*Id.* at 5.

Defendant Knowles raised three challenges to his prosecution in the United States.  First, he argues that the indictment must be dismissed insofar as it alleges conspiracy to possess narcotics with intent to distribute because while the substantive provision, 21 U.S.C. § 959(b) (2012), proscribes manufacture, distribution, and possession aboard an aircraft registered in the United States, the provision that provides for extraterritorial jurisdiction, 21 U.S.C. § 959(c) (2012), reaches only "acts of manufacture or distribution."  Knowles Mot. at 3–7.  Second, Knowles contends that section 959(b) is unconstitutional because Congress lacked the enumerated power to criminalize "drug trafficking on board a United States registered airplane without limitation."  *Id.*

5

at 7–10.[3]   Finally, Knowles asserts that the prosecution violates his due process rights because there is not a "sufficient nexus between the defendant and the United States," and so the application of section 959(b) to his conduct would be "arbitrary or fundamentally unfair."  *Id.* at 10–12, quoting *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011).

The government responds that "Knowles's interpretation of the statute is contrary to the statute's plain language and history, as well as rules of statutory construction."  Opp. (Knowles) at 4.  It argues that section 959(b) was authorized by Congress's enumerated power to regulate foreign commerce, and that it is necessary and proper to implement the treaty power.  *Id.* at 9–11. Finally, it contends that the due process arguments should fail because the defendants "cannot reasonably claim that [they] did not know [their] conduct was illegal, as 'drug trafficking is condemned universally by law-abiding nations,'" Opp. (Thompson) at 6, quoting *United States v. Suerte*, 291 F.3d 366, 371 (5th Cir. 2002), and because "there is nothing arbitrary or fundamentally unfair about haling [defendants] into U.S. court for conspiring to use U.S. aircraft to traffic cocaine."  Opp. (Knowles) at 14.

### STANDARD OF REVIEW

A criminal defendant may move to dismiss an indictment before trial based on a "defect in the indictment," such as the "failure to state an offense."  Fed. R. Crim. P. 12(b)(3)(B).  But a dismissal of an indictment "is granted only in unusual circumstances," because "a court's 'use[] [of] its supervisory power to dismiss an indictment . . . directly encroaches upon the fundamental role of the grand jury.'"  *United States v. Ballestas*, 795 F.3d 138, 148 (D.C. Cir. 2015), quoting *Whitehouse v. U.S. Dist. Court*, 53 F.3d 1349, 1360 (1st Cir. 1995).  For an indictment to

---

3        Defendant Thompson has joined in these attacks on the prosecution.  Mot. to Join & Adopt Mot. of Codefendant; Min. Entry (May 19, 2016).

sufficiently state an offense, it need only "inform the defendant of the nature of the accusation against him," *id.* at 148–49, quoting *United States v. Hitt*, 249 F.3d 1010, 1016 (D.C. Cir. 2001), or, in other words, it must inform the defendant of "the precise offense of which he is accused so that he may prepare his defense." *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014). Constitutional objections that challenge the validity of the charge are properly brought under Rule 12. *See United States v. Seuss*, 474 F.2d 385, 387 n.2 (1st Cir. 1973).

Under the Federal Rules of Criminal Procedure, an indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c). "When considering a motion to dismiss an indictment, a court assumes the truth of [the government's] factual allegations." *Ballestas*, 795 F.3d at 149, citing *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952).

## ANALYSIS

The statutory provision at the heart of this case, 21 U.S.C. § 959(b) (2012), is entitled "Possession, manufacture, or distribution by person on board aircraft," and it provides:

> It shall be unlawful for any United States citizen on board any aircraft, or any person on board any aircraft owned by a United States citizen or registered in the United States, to –
>
> > (1) manufacture or distribute a controlled substance or listed chemical; or
> >
> > (2) possess a controlled substance or listed chemical with intent to distribute.

21 U.S.C. § 959(b) (2012).

In a section entitled "Acts committed outside territorial jurisdiction of United States; venue," the statute addresses extraterritorial jurisdiction:

> This section is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States. Any person who violates this section shall be tried in the United States district

court at the point of entry where such person enters the United States, or in the United States District Court for the District of Columbia.

21 U.S.C. § 959(c) (2012).

## I.    The Court has jurisdiction over the defendants.

The starting point for the consideration of the pending motions in this case is the "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010), quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991); *see also id.* ("When a statute gives no clear indication of an extraterritorial application, it has none."); *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013). As the D.C. Circuit has explained, though, this principle "represents a canon of construction, or a presumption about a statute's meaning, rather than a limit on upon Congress's power to legislate," so "notwithstanding the presumption against extraterritoriality, a statute will be construed to apply extraterritorially if Congress gives a 'clear indication' of that intention." *Ballestas*, 795 F.3d at 144, quoting *Nat'l Austl. Bank*, 561 U.S. at 255.

In the only criminal statute at issue in defendants' motions, Congress was unequivocal about what it had in mind:

> This section is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States.

21 U.S.C. § 959(c) (2012).  And in *Ballestas*, the Court of Appeals held that when a substantive offense is covered by an express extraterritoriality provision, the charge of conspiracy to commit the offense has the same extraterritorial reach.  795 F.3d at 144; *see also Ali*, 718 F.3d at 939.  So there is no dispute that under the precedent that is binding on this Court, the Court has extraterritorial jurisdiction over the prosecution of these defendants for conspiring to distribute a

controlled substance on board an aircraft registered in the United States in violation of 21 U.S.C.
§§ 959(b) (2012), 960(b)(1)(B), and 963.

But the indictment charges the defendants with conspiring both to distribute and to possess
with intent to distribute the cocaine. *See* Redacted Indictment. While there is no question that
section 959(b) proscribes both the distribution of, and the possession with intent to distribute, a
controlled substance on board a U.S. registered aircraft, the extraterritoriality provision in section
959(c) specifies only that it is intended to reach "acts of manufacture or distribution" outside of
the United States. 21 U.S.C. §§ 959(b), (c) (2012). Because "when a statute provides for some
extraterritorial application, the presumption against extraterritoriality operates to limit that
provision to its terms," *Nat'l Austl. Bank*, 561 U.S. at 265, defendants argue that the indictment
must be dismissed, at least in part, to eliminate possession with intent to distribute as an alternative
object of the conspiracy, since Congress did not clearly express its intention to reach that offense
outside of the United States. Knowles Mot. at 7.

Another court in this district has recently rejected this argument. *See United States v.
Bodye*, No. 11-cr-110 (JDB), 2016 WL 1091058, at *2–4 (D.D.C. Mar. 21, 2016). Based upon its
analysis of the text of the provision and the structure of the statute as a whole, this Court reaches
the same conclusion. Section 959 provides the necessary "clear indication" that Congress intended
to extend the court's jurisdiction beyond U.S. borders to reach the offense charged in the
indictment. *See id.*; *see also Ballestas*, 795 F.3d at 144, quoting *Nat'l Austl. Bank*, 561 U.S. at
255.

First of all, the plain language of the jurisdictional provision in subsection 959(c), "this
statute is intended to reach *acts of* manufacture or distribution" – as opposed to, for example, "this
statute is intended to reach *the* manufacture or distribution" – is broad enough to express an

intention to reach possession with intent to distribute and certainly conduct in furtherance of a conspiracy to possess with intent to distribute. *See* 21 U.S.C. § 959(c) (2012); *see also United States v. Fawaz*, slip. op. at 3 (S.D.N.Y. June 7, 2013) (observing that the phrase "acts of distribution" fairly encompasses possession with intent to distribute, and that possession may be an integral part of the process of distribution). So the Court does not need to rewrite the statute to find that it applies in this case.

The extraterritorial design is also reflected in other aspects of section 959, and the legislature's intent becomes quite evident when one reviews the statute in its entirety and considers its structure, context, and purpose. *See Nat'l Austl. Bank*, 561 U.S. at 265 ("Assuredly context can be consulted as well."). The original version of section 959 was enacted as part of the Comprehensive Drug Abuse Prevention and Control Act of 1970 ("DAPCA"), and that statute contained a core provision, section 841, that made it unlawful to manufacture, distribute, or possess with intent to distribute a controlled substance within the United States. Pub. L. No. 91-513, § 401, 84 Stat. 1236, 1260–61 (1970). Section 959, by contrast, included an express extraterritoriality provision, and it prohibited the manufacture or distribution of a controlled substance anywhere, but only if it was done with the intent or knowledge that the drugs would be unlawfully imported into the United States. *Id.* § 1009, 84 Stat. at 1289. So the object behind enacting section 959 was to reach conduct occurring outside the United States that would not be covered otherwise, and it was the planned importation that provided the jurisdictional hook at that time.

When section 959 was amended in 1986, the original prohibition against manufacture and distribution with the intent to import remained embodied in section (a), and the prohibition against possession with intent to distribute was added in section (b). *See* Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, § 3161, 100 Stat. 3207 (1986). But section 959 does not proscribe possession

with intent to distribute in general – only the possession on board an aircraft with a U.S. nexus – and it does not proscribe possession with intent to distribute alone.

Section 959(b), which is entitled "Possession, manufacture, or distribution by person on board aircraft," provides:

> It shall be unlawful for any United States citizen on board any aircraft, or any person on board any aircraft owned by a United States citizen or registered in the United States, to –
>
> (1) manufacture or distribute a controlled substance or listed chemical; or
>
> (2) possess a controlled substance or listed chemical with intent to distribute.

21 U.S.C. § 959(b) (2012). The Court finds it significant that the prohibitions against manufacture and distribution are repeated in section (b) along with possession with intent to distribute, with the use of a U.S. aircraft as the new, alternative jurisdictional predicate for the extraterritorial reach. The foundational element of the involvement of a U.S. citizen on board the aircraft, or the U.S. ownership or registry of the aircraft, applies to both subsections 959(b)(1) and (b)(2), and there would have been no reason to premise all of section (b) on this very specific U.S. nexus if only one of the prongs of the section was meant to extend to conduct abroad. So the nexus requirement supports the conclusion that *all* of subsection (b) was meant to reach outside of the United States – indeed that seems to be the goal of the airplane provisions. And the fact that the new provision was inserted in the particular section of DAPCA that was already extraterritorial in its entirety lends further support to the notion that Congress expected it to have a similar reach. *See Bodye*, 2016 WL 1091058, at *3.

As the courts noted in *Bodye* and *Fawaz*, it is significant that the three provisions that comprise section 959 were not all enacted at the same time. "If the possession prohibition and the extraterritoriality provision had been enacted simultaneously, it would be hard to avoid [the]

conclusion that the omission of 'possession' from the latter was intentional and hence meaningful."

*Bodye*, 2016 WL 1091058, at *3. But "[t]he fact that § 959(b) was added only in 1986 weakens

any inferences to be drawn from differences between § 959(b) and 959(c)." *Fawaz*, slip. op. at 4

n.2, citing *Gomez-Perez v. Potter,* 553 U.S. 474, 486 (2008).

Moreover, Knowles's interpretation would render section 959(b)(2) to be superfluous:

> [I]f § 959(b)(2) did not have extraterritorial reach, it would only cover
> conduct that was already prohibited by 21 U.S.C. § 841 . . . . Since its
> enactment in 1970, § 841 has forbidden anyone to "possess with intent
> to . . . distribute . . . a controlled substance" . . . including on board
> airplanes . . . . Thus, it would have been pointless for Congress in 1986 to
> have enacted § 959(b)(2) without extraterritorial application – possession
> with intent to distribute on aircraft *within* the United States was clearly
> already illegal.

*Bodye*, 2016 WL 1091058, at *3; *see also id.* ("[T]he 'canon that statutes should be read to avoid

making any provision superfluous, void, or insignificant' strongly supports reading § 959(b)(2) as

having extraterritorial reach."), quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 575 (2011); *Fawaz*,

slip. op. at 4.

Furthermore, as the other two courts have observed, Knowles's reading of the statute lacks

logic. It "would render § 959(b)(2) a stranger to the statute – a lone provision of only territorial

application in a family of provisions with extraterritorial reach," *Fawaz*, slip. op. at 4, when there

is no justification for that anomaly. As the court in *Bodye* concluded:

> [I]f § 959(b)(2) were limited to conduct occurring within the United States,
> the nexus requirement would serve no function other than to carve out a
> strange exception for foreign defendants on foreign planes. It simply does
> not make sense to impose this non-territorial nexus requirement unless the
> prohibition in § 959(b)(2) applies to conduct abroad.

2016 WL 1091058, at *4.

This interpretation is also consistent with the decision in *United States v. Lawrence*, 727

F.3d 386 (5th Cir. 2013), in which the Fifth Circuit concluded that "an analysis of both the statutory

language and structure of the statute" supported extraterritorial application of the prohibition against possession with intent to distribute in section 959(b).  *Id.* at 393.  As part of its statutory analysis, the court pointed out that the second sentence of section 959(c), which states that "any person who violates this section shall be tried in the United States District Court at the point of entry where such person enters the United States or in the United States District Court for the District of Columbia," applies to the violation of the entire statute, including section 959(b)(2), and there can be no argument that the venue provision in section 959(c) is limited to manufacture and distribution only.  *See id.*

For all of these reasons, the Court finds that the statute supplies the Court with jurisdiction over the offense alleged in the indictment.

## II.    Congress had the power to enact the extraterritoriality provision

Knowles argues next that even if Congress intended to give the courts extraterritorial reach in this instance, it lacked the constitutional authority to do so.  Knowles Mot. at 7–10.  He submits that none of Congress's enumerated powers includes the authority "to criminalize international drug trafficking without any nexus to the United States."  *Id.* at 7.   But the statute challenged here does not "criminalize international drug trafficking without any nexus to the United States" – it criminalizes international drug trafficking on board aircraft registered in the United States.  21 U.S.C. § 959(b) (2012).  Knowles seems to concede as much in his reply by arguing that "[t]he prosecution's sole argument in support of the Foreign Commerce Clause argument is that the conspiracy attempted to procure various U.S. registered airplanes.  Even assuming *arguendo* the truth of this allegation, it is an insufficient basis upon which to predicate jurisdiction."  Knowles Reply at 9.  According to Knowles, neither the foreign commerce clause, nor the Offences clause, provide the necessary enumerated power in this case.  Knowles Mot. at 7–10.

The Court must presume that a federal statute is constitutional.  *See United States v. Morrison*, 529 U.S. 598, 607 (2000) ("Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds.").  In light of that presumption, Knowles's enumerated powers objections fail.  Under both the foreign and interstate commerce clauses, both because an aircraft is an "instrumentality" of commerce, and because it was rational for Congress to conclude that international drug trafficking aboard an aircraft registered in the United States would "substantially affect" both foreign and interstate commerce, the Court finds that the statute is constitutional as applied to these defendants.[4]

"The Federal Government 'is acknowledged by all to be one of enumerated powers.'" *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 132 S. Ct. 2566, 2577 (2012), quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 405 (1819).  So, "rather than granting general authority to perform all the conceivable functions of government, the Constitution lists, or enumerates, the Federal Government's powers." *Id.*  "In our federal system, 'Congress cannot punish felonies generally;' it may enact only those criminal laws that are connected to one of its constitutionally enumerated  powers, such as the authority to regulate interstate commerce." *Torres v. Lynch*, 136 S. Ct. 1619, 1624 (2016), quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 428 (1821).

---

4        Defendants are bringing an as-applied challenge to the statute, as they must.  A party bringing a facial challenge "must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745  (1987).  Neither party suggests that Congress would lack the power to prohibit, for example, drug trafficking aboard a domestic flight on an aircraft registered in the United States.  So the Court is concerned only with the application of the statute to defendants' alleged conduct:  use of an aircraft registered in the United States to traffic narcotics internationally.

        It also bears noting that another judge in this district rejected a nearly-identical challenge to Congress's enumerated powers to enact section 959(b), albeit for slightly different reasons. *See Bodye*, 2016 WL 1091058, at *4–6.

Article I, section 8, clause 3 grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. The Constitution further authorizes Congress to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing powers, and all other Powers vested by this Constitution in the Government of the United States." U.S. Const. art. I, § 8, cl. 18.

### A.   The Commerce Clause

The Supreme Court has enumerated "three broad categories of activity that Congress may regulate" under the interstate commerce power:

> First, Congress may regulate the use of channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce.

*United States v. Lopez*, 514 U.S. 549, 558–59 (1995) (internal citations omitted); *see also NFIB*, 132 S. Ct. at 2578, quoting *Morrison*, 529 U.S. at 609.

The Supreme Court has indicated that the foreign commerce power is at least as broad as the power to regulate interstate commerce. *See Japan Line, Ltd. v. Cty. of L.A.*, 441 U.S. 434, 448 (1979) ("Although the Constitution, Art. I, § 8, cl. 3, grants Congress power to regulate commerce 'with foreign Nations' and 'among the several States' in parallel phrases, there is evidence that the Founders intended the scope of the foreign commerce power to be the greater."); *Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 434 (1932) (observing that Congress's "power when

exercised in respect of foreign commerce may be broader than when exercised as to interstate commerce").[5]

But the Supreme Court has never clearly delineated the difference between the foreign commerce clause and the interstate commerce clause.   And the D.C. Circuit has not opined on whether Congress's power to regulate under the foreign commerce clause is equivalent to, or broader than, the power to regulate interstate commerce.   Some Courts of Appeal have analyzed questions surrounding the foreign commerce power using interstate commerce clause jurisprudence.   *See, e.g.*, *United States v. Pendleton*, 658 F.3d 299, 307–11 (3d Cir. 2011); *United States v. Bredimus*, 352 F.3d 200, 205–08 (5th Cir. 2003); *see also United States v. Homaune*, 898 F. Supp. 2d 153, 159–60 (D.D.C. 2012).   Other circuits have used the interstate commerce framework as a guide, but concluded that the foreign commerce clause encompasses broader

---

5        Knowles suggests that the foreign commerce clause permits only the regulation of commerce *with* foreign nations, not *between* foreign nations.  Knowles Mot. at 9; *see also* Knowles Reply at 8.  He finds support in *United States v. Weingarten*, 632 F.3d 60 (2d Cir. 2011), in which the Second Circuit concluded that "a statute criminalizing the transportation of a minor in foreign commerce for unlawful sexual activity did not extend to 'travel occurring wholly between two foreign countries and without any territorial nexus to the United States.'"  Knowles Mot. at 9, quoting *Weingarten*, 632 F.3d at 71.  But *Weingarten* is not binding on this Court, and in any event, it is distinguishable.  First, the Second Circuit emphasized that it was conducting a statutory – and not a constitutional – analysis.  *Weingarten*, 632 F.3d at 71 (describing the "issue of statutory construction").  Second, the court made clear that its statutory construction analysis "would be substantially different if [the statute] prohibited travel for the purpose of engaging in the defined sexual acts where such travel *affects* foreign commerce," *id.*, which is the situation presented in this case.

powers than the interstate commerce clause.  *See, e.g.*, *United States v. Bollinger*, 798 F.3d 201, 208–216 (4th Cir. 2015).[6]

The two clauses are targeted at different concerns.  The interstate commerce clause has been interpreted "against the backdrop of, and constrained by, federalism concerns that are inapposite in the international arena."  *Id.* at 210.  The foreign commerce power, by contrast, "implicates concerns that are different from those present in interstate and tribal regulation."  *Id.* at 212.[7]  But the Court need not choose between these competing tests, because it finds that the statute at issue in this case substantially affects both interstate and foreign commerce, and that even if the foreign commerce power is only as broad as the power to regulate interstate commerce, the statute passes muster under the more restrictive test.

Congress added the aircraft provision, 21 U.S.C. 959(b) (2012), as part of the Anti-Drug Abuse Act of 1986.  Pub. L. No. 99-570, § 3161, 100 Stat. 3207 (1986).  The provision – which regulates the use of aircraft registered in the United States to possess, distribute, or manufacture narcotics – may be fairly assessed as the regulation of either an instrumentality of foreign

---

6      The Ninth Circuit has also expressed the view that the methods of analysis for the two clauses should be different.  *United States v. Clark*, 435 F.3d 1100, 1103 (9th Cir. 2006) (finding that using the interstate commerce clause to resolve foreign commerce clause issues "can feel like jamming a square peg into a round hole," and instead adopting a "global, commonsense approach" to the question of whether a statute properly criminalized commercial conduct overseas).  The Sixth Circuit has expressed skepticism that the foreign commerce power is broader – but declined to articulate a definitive test to analyze the foreign commerce power.  *See United States v. Al-Maliki*, 787 F.3d 784, 791–94 (6th Cir. 2015).

7      The Fourth Circuit suggested, given the lack of federalism concerns, that Congress can regulate any foreign commerce activities that "demonstrably affect such commerce."  *Bollinger*, 798 F.3d at 215–16.  The Supreme Court has indicated that Congress can, pursuant to its interstate commerce clause power, regulate (1) the channels of interstate commerce; (2) the instrumentalities of interstate commerce; and (3) activities which substantially affect interstate commerce.  *See Lopez*, 514 U.S. at 558–59.

commerce, the airplane itself, or an activity, the trafficking of narcotics aboard a U.S.-registered aircraft, that "substantially affect[s]" both foreign and interstate commerce.

> **1)     Congress may regulate the instrumentalities of commerce, including the airplane used in this case.**

Congress may regulate the channels of interstate commerce by regulating the highways, airspace, and navigable waterways of interstate transportation.  *See Lopez*, 514 U.S. at 558. Congress may also regulate the instrumentalities of commerce by regulating, for example, the means of interstate travel, *id.*, and the intrastate destruction of aircraft.  *Id.*, citing *Perez v. United States*, 402 U.S. 146, 150 (1971).  So Congress may regulate an instrumentality of both interstate

and foreign commerce – an airplane – which was registered under the laws of the United States[8]

and found in a foreign nation – pursuant to its commerce powers.

**2)   Congress may also regulate activities which substantially affect commerce.**

"The power over activities that substantially affect interstate commerce can be expansive."

*NFIB*, 132 S. Ct. at 2578.  But that power has limits.  Congress may regulate non-economic

---

[8]     The requirements for the registration of aircraft are set forth at 49 U.S.C. § 44101 *et seq.*  Those regulations are not particularly relevant here, but it is notable that registration of aircraft is limited to United States citizens and lawful permanent residents, or foreign corporations that are organized and doing business under the laws of the United States or using the plane primarily in the United States.  *See id.* § 44102.  Defendant Knowles states that "registration is not limited to citizens of the United States, but is available to foreign individuals and corporations,"  Knowles Mot. at 10 n.3; *see also* Knowles Reply at 9 (describing aircraft registration as "entirely a creature of domestic administrative law"), and he cites to the Federal Aviation Administration's website.  *See* Knowles Mot. at 10 n.3; *see also* Knowles Reply at 9.  But the FAA website correctly reflects the statutory requirement that the only individual foreign citizen who can register a plane here is one "lawfully admitted for permanent residence in the U.S."  *See* "Aircraft Registry, Register an Aircraft," Fed. Aviation Admin., http://www.faa.gov/licenses_certificates/aircraft_certification/aircraft_registry/register_aircraft/ (last visited June 15, 2016).

And the Court takes issue with Knowles's characterization of the registration scheme as "entirely a creature of domestic administrative law."  Knowles Reply at 9.  While it is true that the procedure for obtaining U.S. registration is set forth in U.S. regulations, defendant's focus on the domestic aspect of the system ignores the international purpose behind aircraft registration in general and the use of country-specific codes in particular.  In 1944, the parties to the Convention on International Civil Aviation announced:  "[a]ircraft have the nationality of the State in which they are registered," and "[e]very aircraft engaged in international air navigation shall bear its appropriate nationality and registration marks."  Convention on Int'l Civil Aviation, Art. 17, 20.  Dec. 7, 1944, 61 Stat. 1180, 15 U.N.T.S. 296.  The Convention established the United Nations International Civil Aviation Organization, which maintains the international standards for aircraft registration, including the alphanumeric codes used to identify the country of registration.  *See* Convention on Int'l Civil Aviation, http://www.icao.int/secretariat/legal/List%20of%20 Parties/Chicago_EN.pdf (list of parties) (last visited June 15, 2016); Aircraft Nationality Marks, Nat'l Emblems & Common Marks, http://www.icao.int/safety/airnavigation/NationalityMarks/ NationalityMarks%20WEB%20en.pdf (last visited June 15, 2016);  *see also* 14 C.F.R. § 45.21(a) ("[N]o person may operate a U.S.-registered aircraft unless that aircraft displays nationality and registration marks . . . ."); *id.* § 45.23 ("Each operator of an aircraft must display . . . aircraft marks consisting of the Roman capital letter 'N' (denoting United States registration) followed by the registration number of the aircraft.").  In short, the country code is a creation of international convention that conveys an internationally understood message.

criminal activity, but only where that activity has a substantial effect on commerce, *Morrison*, 529 U.S. at 610, and only when Congress articulates a "rational basis" to conclude that the activity would have a substantial effect on commerce. *Lopez*, 514 U.S. at 557. In the Court's view, even if the limits on Congressional power that apply to the regulation of interstate commerce extend to foreign commerce, that test has been met in this case.

The Supreme Court expounded on the rational basis requirement in *Gonzales v. Raich*, 545 U.S. 1 (2005). In *Raich*, the Court assessed whether Congress could prohibit the local and intrastate cultivation and use of marijuana, which had become legal under California state law. *Id.* at 6–8. The Court noted that Title II of DAPCA, also known as the Controlled Substances Act ("CSA"), made the following findings, among others, about the impacts of narcotics trafficking on commerce:[9]

> A major portion of the traffic in controlled substances flows through interstate and foreign commerce. Incidents of the traffic which are not an integral part of the interstate or foreign flow, such as manufacture, local distribution, and possession, nonetheless have a substantial and direct effect upon interstate commerce because –
>
> (A)   after manufacture, many controlled substances are transported in interstate commerce,
>
> (B)   controlled substances distributed locally usually have been transported in interstate commerce immediately before their distribution, and
>
> (C)   controlled substances possessed commonly flow through interstate commerce immediately prior to such possession.

---

9      It is true that "Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce." *Lopez*, 514 U.S. at 562. However, Congressional findings "enable [the Court] to evaluate the legislative judgment that the activity in question substantially affected interstate commerce." *Id.* at 563. In *Lopez*, the Court struck down the Gun-Free School Zones Act of 1990, which prohibited the possession of guns in school zones, because that law contained "no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* at 561.

*Id.* at 12 n.20, quoting 21 U.S.C § 801(3).  Given those findings, the Court found "no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA."  *Id.* at 22.  The Court concluded that Congress could lawfully proscribe the purely intrastate cultivation of marijuana through the CSA as a necessary and proper means to implement the commerce clause. *Id.*; *see* U.S. Const. art. I, § 8.[10]

The provision under which defendants are charged, 21 U.S.C. § 959 (2012), was also originally enacted as part of the statute involved in *Raich*.  *See* DAPCA § 1009, 84 Stat. 1289.  So, the operative statute begins with the same Congressional pronouncements that the Court recited in *Raich*, and they apply with equal force to section 959(b).  The preamble to DAPCA sets forth Congress's understanding that drugs travel through both interstate and foreign commerce, and that all drug trafficking – even purely intrastate activity – affects interstate commerce.  *See* 21 U.S.C. § 801.  So, for section 959 to be valid, the Court needs to only find that Congress had a rational basis for concluding that acts of drug distribution committed on aircraft registered in the United States would have a similar substantial effect on interstate or foreign commerce.  *See Raich*, 545 U.S. at 22.

The legislative history of the amendment of the statute in the Anti-Drug Abuse Act of 1986 does not appear to expressly address the issue.  But this is not a difficult proposition to accept

---

10     Knowles points out that the fact that an airplane has been registered does not prove that the plane was authorized to fly.  Knowles Mot. at 10 n.3; Knowles Reply at 9.  But just because the aircraft is not in commerce does not mean that Congress cannot regulate it.  *See Raich*, 545 U.S. at 22 (holding that Congress can regulate activities that appear on their face to be not in commerce – like the wholly intrastate cultivation of marijuana – when those activities "substantially affect" interstate commerce).  Moreover, the regulations do provide that a plane cannot fly *unless* it has been registered.  *See* 14 C.F.R. § 21.173 ("Any registered owner of a U.S.-registered aircraft . . . may apply for an airworthiness certificate for that aircraft.").

given the location of many sources for controlled substances and the need for efficient means to transport the drugs elsewhere.  Also, one of the stated policy reasons behind the requirement that aircraft be registered in the first place is to "provid[e] assistance to law enforcement agencies in the enforcement of laws related to the regulation of controlled substances, to the extent consistent with aviation safety."  49 U.S.C. § 40101(d)(7).  And when Congress amended DAPCA in 1986, it described the Anti-Drug Abuse Act, which contained the aircraft provision now embodied in section 959(b), as follows:

> An Act to strengthen Federal efforts to encourage foreign cooperation in eradicating illicit drug crops and in halting international drug traffic, [and] to improve enforcement of Federal drug laws and enhance interdiction of illicit drug shipments . . . .

Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207 (1986).  So, the title of the Public Law put before the legislature referred explicitly to international drug trafficking – which is undeniably a part of foreign commerce – and tied it to U.S. drug enforcement, which was already tied to interstate commerce in 21 U.S.C. § 801(3).  Congress further made specific findings that "a greater international effort is required to address [the growing narcotics threat to the international community]."  *Id.* § 2020(2).  Therefore, based on *Raich*, the broad statements in the aircraft registration statute, and the Anti-Drug Abuse Act, the Court concludes that Congress had a rational basis to conclude that drug trafficking aboard an aircraft registered in the United States would have a substantial effect on interstate and international commerce.[11]

---

11     The question could also be framed, in the words of the Ninth Circuit, as applying a "global, commonsense approach" to the issue of whether regulating the use of a U.S. registered aircraft is a regulation on overseas commerce, *Clark*, 435 F.3d at 1103, or, under the Fourth Circuit's formulation, whether use of the aircraft is an "activity that could have a demonstrable effect" on commerce.  *Bollinger*, 798 F.3d at 215–16.  Under any of the prevailing tests, Congress would have had the power to enact 21 U.S.C. § 959(b) (2012).

### 3)   Congress was also concerned about the international nature of drug trafficking.

The fact that Congress enacted the Anti-Drug Abuse Act to target foreign drug trafficking

in particular is also reflected in the presence of another provision in the statute, section 2021:

> (a) CONGRESSIONAL SUPPORT. – The Congress hereby declares its support for United Nations General Assembly Resolution 40/122 adopted on December 13, 1985, in which the General Assembly decided to convene in 1987, an International Conference on Drug Abuse and Illicit Trafficking in order to generate universal action to combat the drug problem in all its forms at the national, regional, and international levels, and to adopt a comprehensive outline of future activities.

> (b) UNITED STATES PARTICIPATION. – With respect to United States participation in the International Conference on Drug Abuse and Illicit Trafficking, the Congress calls on the President –

>> (1) to appoint the head of the United States delegation well in advance of the conference; and

>> (2) to ensure that necessary resources are available for United States preparation and participation.

Anti-Drug Abuse Act of 1986, § 2021, Pub L. No. 99-570, 100 Stat. 3207 (1986).  This provision

indicates that Congress clearly enacted the 1986 amendments with an eye towards the upcoming

international effort to address drug distribution in a concerted way.

The treaty that eventually resulted was the 1988 United Nations Convention against Illicit

Traffic in Narcotic Drugs and Psychotropic Substances.[12]   That agreement begins with the

following preface:

> *The parties to this Convention,*

> *Deeply concerned* by the magnitude of and rising trend in the illicit production of, demand for, and traffic in narcotic drugs and psychotropic substances, which pose a serious threat to the health and welfare of human

---

12     Though Congress did not explicitly reference the Commission on Narcotic Drugs, the group that was ultimately responsible for drafting the treaty, U.N. General Assembly Resolution 40/122, cited in section 2021 of the Anti-Drug Abuse Act, "not[ed] the work of the Commission of Narcotic Drugs towards the preparation of a draft convention against illicit traffic in narcotic drugs and psychotropic substances."  G.A. Res. 40/122 (Dec. 13, 1985).

> beings and adversely affect the economic, cultural, and political foundations of society, . . .
>
> *Recognizing* the links between illicit traffic and other related organized criminal activities which undermine the legitimate economies and threaten the stability, security and sovereignty of States,
>
> *Recognizing also* that illicit traffic is an international criminal activity, the suppression of which demands urgent attention and the highest priority . . .
>
> *Hereby agree* as follows . . . .

United Nations Convention Against Illicit Traffic in Narcotic Drugs & Psychotropic Substances, Dec. 19, 1988, 1582 U.N.T.S. 95 ("U.N. Narcotics Convention").

With those principles in mind, in Article 4, entitled "Jurisdiction," the parties to the Convention agreed that each party to the treaty:

> a)    Shall take such measures as may be necessary to establish its jurisdiction over the offences it has established in accordance with article 3, paragraph 1, when:
>
> i)    The offence is committed in its territory;
>
> ii)   The offence is committed on board a vessel flying its flag or an aircraft which is registered under its laws at the time the offence is committed.

*Id.*, art. 4.  So, the treaty requires that each party "shall . . . establish as criminal offences" the "manufacture . . . distribution . . . [or] possession" of narcotics, *id.*, art. 3, ¶ 1, and "[s]hall . . . establish jurisdiction" over those offenses when they are committed on "an aircraft which is registered" in that country.  *Id.*, art. 4.

The U.N. Narcotics Convention thus makes clear that the international community was deeply concerned about the economic effects of international drug trafficking.  And Congress was already aware, when it passed the aircraft provision, that the international community would be meeting to update its treaty obligations to address this pressing issue.  So even though the treaty was not opened for signature until two years after Congress passed the Anti-Drug Abuse Act,

Congress officially expressed its support for the international effort in the very statute at issue here.[13]  Thus, given the clear relationship between section 959(b) and both foreign and interstate commerce that brings the statute under the auspices of an enumerated power, the only question that remains is whether the statutory provision was necessary and proper to implement that commerce power.[14]

---

13     Defendants voice strong objection to the scope of section 959(b), which they characterize as an expansive proscription reaching conduct with no connection to the United States.  But while it is clear that Congress recognized that the broad spectrum of international drug trafficking activity could have a significant impact on both foreign and domestic commerce, the statutory provision in question here is actually quite targeted, and it reaches only that slice of narcotics distribution activity conducted on airplanes owned by U.S. citizens or registered in the United States.

14     The Court need not reach the government's alternative argument that the statute is necessary and proper to implement the 1961 United Nations Single Convention on Narcotic Drugs. Opp. (Knowles) at 10–11.  The government points out that the Convention required the parties to criminalize "any other action which in the opinion of such Party may be contrary to the provisions of this Convention."  *Id.* at 10, citing United Nations Single Convention on Narcotic Drugs, 1961, art. 36(1), Mar. 30, 1961, 520 U.N.T.S. 151.  It is true that Congress may, under its necessary and proper authority, legislate beyond its enumerated powers to implement the Executive's power to "make treaties."  *See, e.g.*, *Missouri v. Holland*, 252 U.S. 416 (1920).  In this case, though, there is no evidence that Congress enacted the aircraft provision to implement the Single Convention. Though the government correctly points out that the "Congressional findings" set forth in DAPCA noted that the United States was party to the Single Convention, *see* 21 U.S.C. § 801(7), that reference was contained in the legislation in 1970, and it came well before  the Anti-Drug Abuse Act added the aircraft provision in 1986.  *See* Anti-Drug Abuse Act of 1986, § 3161, Pub. L. No. 99-570, 100 Stat. 3207.  It is therefore far from clear that Congress had the 1961 Single Convention in mind when it added the aircraft provision in 1986.  The provision does closely track the requirements of Article 4 of the 1988 U.N. Narcotics Convention, but when Congress passes implementing legislation for a treaty, it tends to do so explicitly, and here, the statute preceded the effective date of the treaty.  *See, e.g.*, *Bond v. United States*, 134 S. Ct. 2077, 2083–85 (2013) (discussing the law that implements the "Convention on the Prohibition of the Development, Production, Stockpiling, and Use of Chemical Weapons," entitled "Chemical Weapons Convention Implementation Act.").  The Court does not hold that Congress *must* be explicit when it passes legislation to implement a treaty, but it need not reach the question of whether the treaty power provides further authority in this case.

B.     **The Necessary and Proper Clause**

Congress is empowered to "make all Laws Necessary and Proper for carrying into Execution" its enumerated powers.  U.S. Const. art. I, § 8, cl. 10.  The Supreme Court has explained that the scope of that power is "broad":

> We have long read this provision to give Congress great latitude in exercising its powers:  "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."

*NFIB*, 132 S. Ct. at 2579, quoting *McCulloch*, 17 U.S. (4 Wheat.) at 421.  The Court has, pursuant to the necessary and proper clause, upheld laws that are "convenient, or useful" or "conducive" to the authority's "beneficial exercise."  *United States v. Comstock*, 560 U.S. 126, 133–34 (2010), quoting *McCulloch*, 17 U.S. (4 Wheat.) at 408.  The Court has "made clear" that it only needs to "look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power."  *Id.* at 134, citing *Sabri v. United States*, 541 U.S. 600, 605 (2004).

Congress was concerned with the flow of narcotics in foreign commerce, *see* 21 U.S.C. § 801(3), and it enacted the aircraft registration requirements, in part, to be of assistance in the interdiction of illegal drug trafficking.  *See* 49 U.S.C. § 40101(d)(7) (finding that "providing assistance to law enforcement agencies in the enforcement of laws related to regulation of controlled substances" is "in the public interest").  Those concerns found their way into a single statute:  21 U.S.C. § 959(b) (2012).  The Court therefore concludes that Congress had the power

to pass this law, which was "rationally related to the implementation of" its commerce power.  *See Comstock*, 560 U.S. at 133–34.[15]

## III.    The exercise of jurisdiction comports with due process.

Defendant Thompson, joined by defendant Knowles, has also moved to dismiss on the grounds that the exercise of extraterritorial jurisdiction in this case – whether or not it was authorized by the statute – does not comport with the Constitution.  Thompson Mot. at 2–8; *see also* Knowles Mot. at 10–12.  Thompson claims that facing trial in the United States would be fundamentally unfair and a violation of his right to due process because he is a Jamaican citizen; he lives in Colombia; all of the steps he allegedly took in furtherance of the conspiracy took place in Colombia; the drugs were not bound for the United States; and there is no evidence that he or his co-conspirators performed any acts in furtherance of this conspiracy in the United States. Thompson Mot. at 5.[16]  Knowles is a Bahamian citizen who was living in Colombia at the time of this offense.  Knowles Mot. at 11.  The indictment charges that "in the Bahamas, Colombia, Haiti,

---

[15]    Knowles also argues that the statute is not supported by the power to "define and punish . . . Offences against the Law of Nations."  Knowles Mot. at 7, citing U.S. Const., art. I, § 8, cl. 10.  He asserts that "[d]rug trafficking was not a violation of customary international law at the time of the Founding, and drug trafficking is not a violation of customary international law today."  *Id.* at 7–8, citing *United States v. Bellaizac-Hurtado*, 700 F.3d 1245, 1253–54 (11th Cir. 2012).  Though the U.N. Narcotics Convention makes clear that drug trafficking is of international concern, it is far from clear that drug trafficking would constitute a violation of the "law of nations."  Perhaps for that reason, the government did not respond to defendant's argument about the Offences clause.  But the Court need not reach the issue of whether the U.N. Narcotics Convention modified customary international law, or whether either the treaty or customary international law meets the definition of "the law of nations," in light of its holding that the statutory provision was authorized under the commerce clause.

[16]    As the D.C. Circuit has observed, there may be some inconsistency between the defendants' efforts to vindicate rights under the U.S. Constitution and their insistence that they should not be subject to U.S. law.  *See Ali*, 718 F.3d at 943 ("it may be logically awkward for a defendant to rely on what could be characterized as an extraterritorial application of the U.S. Constitution in an effort to block the extraterritorial application of U.S. law."), quoting Curtis A. Bradley, *Universal Jurisdiction & U.S. Law*, 2001 U. Chi. Legal F. 323, 338 (2001).

Honduras, Venezuela, the Dominican Republic, and elsewhere," the defendants conspired to distribute and possess with intent to distribute cocaine on board an aircraft registered in the United States.  Redacted Indictment at 1–2.  The case centers around a thwarted attempt to move drugs from Venezuela to Honduras, utilizing an airplane that was supposed to be flown by Bahamian-based pilots from the Bahamas to Venezuela, but was seized when it made a stop en route and landed in Haiti.

Neither the Supreme Court nor the D.C. Circuit has addressed whether the due process clause applies in this circumstance. In *Ballestas*, 795 F.3d 138, the D.C. Circuit observed that "[o]ur Circuit has yet to decide 'whether the Constitution limits the extraterritorial exercise of federal criminal jurisdiction.'" *Id.* at 148, quoting *Ali*, 718 F.3d at 943–44.  The *Ballestas* Court went on to explain that even if one assumes there are constitutional constraints, "the ultimate question' under the Due Process Clause . . . is whether application of the statute to the defendant [would] be arbitrary or fundamentally unfair." *Id.*, citing *Ali*, 718 F.3d at 944 (alteration in original) (internal quotations omitted); s*ee also Ali*, 718 F.3d at 944 (noting, when declining to apply the principles related to personal jurisdiction, that "[t]o the extent the nexus requirement serves as a proxy for due process, it addresses the broader concern of ensuring that 'a United States court will assert jurisdiction only over a defendant who should reasonably anticipate being haled

into court in this country'"), quoting *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1257 (9th Cir. 1998).[17]

The government cites a number of cases involving prosecutions under section 959 or the similarly extraterritorial Maritime Drug Law Enforcement Act in which due process challenges were denied by the courts.  Opp. (Thompson) at 6–9; Opp. (Knowles) at 12–15.  But those cases and many of the authorities reviewed by the Court are distinguishable because the defendants in the previous prosecutions had some personal connection with the United States, or they directed their conduct in some way towards the United States, and those facts were specifically relied upon, at least in part, to establish the fairness of the courts' exercise of jurisdiction over the foreign conduct.  *See Blackmer v. United States*, 284 U.S. 421, 437 (1932) (the defendants were United States citizens who violated U.S. law through acts performed abroad); *Ballestas*, 795 F.3d at 141–42 (explaining that the drug traffickers used boats to transport cocaine that was "ultimately destined for the United States," and that the defendant "provided maps and law enforcement reports purporting to reveal the location of United States, Colombian, and other nations' air and maritime forces," which the defendant used to evade detection by U.S. law enforcement); *Lawrence*, 727 F.3d at 388–89 (conspiracy involved U.S. citizens who used U.S. passports to travel from Texas to South America to traffic narcotics, and took actions while in Texas in furtherance of the conspiracy); *Bodye*, 2016 WL 1091058, at *1, *7 (the defendant was a legal resident of the

---

[17]    Thompson recognizes that this Court is bound to apply the standard from *Ballestas* and *Ali*, but wishes to preserve his argument that the test should be one derived from the personal jurisdiction jurisprudence:  whether the defendant purposely directed his conduct towards the United States.  Thompson Mot. at 3 n.2.  So, Thompson moved to dismiss based on the principle set out in *Al Kassar*, that "in order to apply extraterritorially a federal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair," 660 F.3d at 118, quoting *United States v. Yousef*, 327 F.3d 56, 111 (2d Cir. 2003), and he does not focus directly on the standard articulated by this Circuit.

United States, and was living in the United States at the time of the conspiracy); *United States v. Mosquera-Murillo*, No. 13-cr-134, 2015 WL 9907796, at *20 (D.D.C. Dec. 14, 2015) (describing the defendants' efforts to "evade interdiction by United States authorities").

Here, the government has made plain that it is not pointing to *any* facts that would connect these defendants or their conspiracy to the United States for purposes of opposing the motion to dismiss, other than the use of the U.S.-registered aircraft. In an Order dated April 15, 2016, the Court specifically asked the government to file a notice informing the Court:

> A. Whether or not it intends to rely upon any facts in opposition to the motions (other than the alleged use of an aircraft owned by a United States citizen or registered in the United States), including but not limited to whether:
>
>> 1) either defendant has any connection to, or directed his activities in any way towards, the United States;
>>
>> 2) either defendant demonstrated an actual awareness that he could face criminal liability in the United States or made any effort to avoid detection by United States law enforcement authorities in particular;
>>
>> 3) either defendant made specific efforts to obtain or utilize aircraft registered in the United States as opposed to aircraft in general; or
>
> B. Whether the government intends to introduce evidence that any co-conspirator engaged in conduct or made statements that the government seeks to attribute to these defendants in order to make such a showing.

Order (Apr. 15, 2016) [Dkt. # 129]. In its response, the government confirmed that it did not

"intend to rely on facts or evidence . . . beyond the fact of the United States registry or ownership

of aircraft sought or used by the defendants in furtherance of the charged drug-trafficking conspiracy." Gov't Notice at 1.[18]

The Court is faced, then, with the pure question of whether an exercise of extraterritorial jurisdiction founded solely upon the use of an aircraft registered in the United States comports with due process. *See id.* at 5 ("Upon a showing that a U.S. aircraft was involved, due process is satisfied and no further showing is required."). No section 959 case to date has gone that far, and the question is more difficult than the flat assertions in the government's oppositions would suggest. *See, e.g.*, Opp. (Thompson) at 7 ("[No one] who conspires to use a U.S. registered or owned plane to traffic drugs [can] reasonably claim that he did not anticipate that such conduct would subject him to the laws of the United States."); Opp. (Knowles) at 14 ("[T]here is nothing

---

18   The government is not even relying upon evidence that the conspirators were deliberately seeking to utilize U.S. registered aircraft in particular to transport their narcotics – only that the airplane they obtained and flew in this instance was registered here. *See* Opp. (Knowles) at 2 ("As part of the conspiracy, Defendants Thompson and Knowles worked together to attempt to utilize various aircraft to traffic cocaine, including U.S. registered and foreign registered aircraft, primarily located in the United States, the Bahamas, the Dominican Republic, Panama, and Belize. One aircraft, among others, that the Defendants conspired to use . . . was a U.S. registered aircraft with tail number N157PA that was ultimately detained and seized in Haiti . . . .").

The notice does allege that the defendants used "numerous" U.S. aircraft, including "aircraft bearing registration numbers N157PA, N376SA, N381CR, N847D, N91CF, N437CG, N4047C, N660WM, N711WX, N63BV, and N97AJ." Gov't Notice at 2. But the Indictment charges only the use of the N157PA aircraft, and the Court has not yet ruled on whether the other aircraft may be referenced as either intrinsic evidence of the charged conspiracy, or under Federal Rule of Evidence 404(b). *See* Redacted Indictment; Gov't's Position on 404(b) and Mot. to Introduce 404(b) Evid. at Trial [Dkt. # 55].

arbitrary or fundamentally unfair about haling [defendant] into U.S. court for conspiring to use U.S. aircraft to traffic cocaine.").[19]

The Court concludes, though, that the binding precedent in this Circuit compels the finding that the prosecution of Thompson and Knowles under section 959(b) is not arbitrary or fundamentally unfair, and that it could have been reasonably anticipated. In deciding whether the application of extraterritorial jurisdiction was lawful in *Ali*, the Court of Appeals found *United States v. Shi*, 525 F.3d 709 (9th Cir. 2008), to be "most on point." *Ali*, 718 F.3d at 944. The defendant in *Shi* was prosecuted under 18 U.S.C. § 2280, which implements the Convention for the Suppression of Unlawful Acts Against the Safety of Maritime Navigation, and the Convention puts foreign offenders on notice that their conduct may be prosecuted by any state party to the Convention. *Shi*, 525 F.3d at 717–24. The D.C. Circuit observed that the treaty in *Shi*, like the treaty at issue in *Ali*, provided "global notice that certain generally condemned acts are subject to prosecution by any party to the treaty," and that "the Due Process Clause demands no more." *Ali*, 718 F.3d at 944.

In the Court's view, the U.N. Narcotics Convention serves the same function here. In Article 3, the nations that are parties to the Convention agreed that each party "shall" adopt measures to criminalize the production, manufacture, sale, or delivery of narcotic drugs under its domestic law, as well as the possession for the purpose of any of those activities. U.N. Narcotics Convention, art. 3, ¶¶ 1(a)(1), 3. The Convention goes on to mandate, in the Article entitled

---

19    By observing that the government offers nothing beyond the fact of the registration, the Court does not mean to suggest that the registration is insignificant. The N number displayed on the airplane's tail was available only to an aircraft owned by a U.S. citizen, a lawful permanent resident, or a foreign corporation organized and doing business in the United States. 49 U.S.C. § 44102(a). So, the participants in this alleged conspiracy were sending a clear and specific message to air traffic controllers and law enforcement authorities that a plane with an established American connection was landing on the foreign airstrip.

"Jurisdiction," that "each party shall take such measures as may be necessary to establish its jurisdiction over the offenses established in accordance with article 3 paragraph 1" in two situations:  first, when "the offense is committed in its territory"; and second, when "the offense is committed on board a vessel flying its flag or an aircraft which is registered under its laws at the time the offence is committed."  *Id.*, art. 4(a).  In other words, whether or not this Convention placed foreign drug dealers on notice that any other aspects of drug trafficking abroad could land them in a foreign court, it specifically announced that all parties to the Convention not only could, but *must* establish their jurisdiction over crimes committed on board aircraft registered under their laws.  The fact that this provision is included in the "Jurisdiction" article, in addition to the provision referencing the parties' jurisdiction over their own territories, makes it clear that the parties to the treaty intended that their jurisdiction would be exercised wherever their airplanes could be found.

Thompson and Knowles are citizens of Jamaica and the Bahamas, respectively, and both of those nations are parties to the U.N. Narcotics Convention.[20]  Their alleged conduct in furtherance of the conspiracy took place in Colombia, which is also a party to the U.N. Narcotics Convention.  The indictment also alleges activity related to Haiti, Honduras, Venezuela, and the Dominican Republic, and all of those nations are parties to the U.N. Narcotics Convention.  So if, as the Court of Appeals stated in *Ali*, "a treaty may provide notice sufficient to satisfy due process," 718 F.3d at 945, under the circumstances present in this case, these defendants were on notice that their use of a U.S. registered aircraft to transport cocaine could subject them to prosecution in the United States.  The Court notes that the district court in *Bodye* reached the same conclusion.  *See*

---

20      A list of the parties to the U.N. Narcotics Convention is available on the United Nations' web site.  *See* U.N. Narcotics Convention, https://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=VI-19&chapter=6&lang=en.

2016 WL 1091058 at *7 ("[E]ven setting Bodye's U.S. residency aside, U.S. prosecution of the conduct alleged here was expressly condoned by international law . . . . [A]ll three of the countries with any reasonable connection to this case agreed long ago that it would be appropriate for the United States to prosecute the conduct alleged here.  The Court does not suppose that aspiring drug-traffickers actually investigate such matters, but Bodye cannot complain that the risk of being haled into a U.S. court was unknowable.").

Thompson argues that the U.N. Narcotics Convention can be distinguished from the treaty involved in *Shi*, and that it does not suffice to meet constitutional concerns because "[n]othing in the Convention (1) suggests that an individual may be prosecuted by another country for his entirely domestic conduct; or (2) adopts conspiracy principles regarding vicarious liability to punish an individual for the acts of coconspirators."  Thompson Mot. at 7.  While the Convention may not contain an express warning that foreign offenders may be prosecuted by any party for any drug trafficking offense, Article 4 does place international drug traffickers on notice that state parties will have extraterritorial reach when their airplanes are involved.  *See* U.N. Narcotics Convention, art. 4.  And the fact that it directs each party to establish its jurisdiction "over the offenses *it* has established in accordance with article 3, paragraph 1" when the offense is committed on board its registered aircraft, *see id.*, art. 4, ¶ (1)(a)(ii) (emphasis added), suggests that each party will be applying its own domestic law to those committing drug trafficking offenses on board the aircraft.  Moreover, article 3, paragraph 1 specifically authorizes, although it does not require, parties to the Convention to prohibit "conspiracy to commit, attempts to commit, and aiding [and] abetting . . . the commission of any of the offences established in accordance with this article." *Id.*, art. 3, ¶ (1)(c)(4).  So the Convention is not silent on this issue, and Thompson's arguments are not persuasive.

Moreover, there are additional facts that support the conclusion that these co-conspirators could have reasonably understood that their alleged conduct was illegal, whether or not they specifically anticipated prosecution in the United States.  *See Ali*, 718 F.3d at 944, citing *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964).  The government has explained that its evidence will consist of a substantial amount of evidence collected by its international law-enforcement partners.  *See* Gov't Resp. in Opp. to Def. Knowles's Mot. for Suppression of Audio Recording Evid. [Dkt. # 90] at 2–3 (explaining that the government seeks to introduce 180 recorded telephone conversations and text messages intercepted by Columbian and Bahamian law enforcement).  The government has also indicated that the defendants spoke in coded language to avoid detection by law enforcement, in case their communications were being monitored.  *See* Gov't's Position on 404(b) and Mot. to Introduce 404(b) Evid. at Trial [Dkt. # 55] at 9 (discussing that one member of the conspiracy used "coded and cryptic terms" such as "'cloth' and 'sail'" to refer to transporting cocaine on a boat, and Knowles "used the coded term 'slow car.'").

Finally, while defendants are correct that some courts have held that drug trafficking is not subject to universal jurisdiction under customary international law, *see Ali*, 718 F.3d at 945; *Bellaizac-Hurtado*, 700 F.3d at 1253–54, the D.C. Circuit has made clear that "it is the 'universal condemnation of the offender's conduct,' not some theory of universal jurisdiction, that drove the Ninth Circuit's reasoning" in the *Shi* case.  *Ali*, 718 F.3d at 945, quoting *Shi*, 525 F.3d. at 723.  The Court underscored that the availability of universal jurisdiction as a matter of international law was "not a necessary premise to [the] conclusion that a treaty may provide notice sufficient to satisfy due process."  *Id.*  Therefore, applying the law of this Circuit, the Court concludes that the application of extraterritorial jurisdiction to these defendants in this case comports with due process.

35

## CONCLUSION

Pursuant to Federal Rule of Criminal Procedure 12, and for the reasons stated above, it is hereby

**ORDERED** that defendant Thompson's Motion to Dismiss the Indictment [Dkt. # 120], and defendant Knowles's Motion to Dismiss the Indictment [Dkt. # 128] are **DENIED**.

**SO ORDERED**.

AMY BERMAN JACKSON
United States District Judge

DATE:  June 16, 2016